UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **JACQUELYN WILLIAMS,** | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION   1:21-cv-04417-MLB-LTW |
| | ) | |
| v. | ) | |
| | ) | |
| **PASCHAL'S RESTAURANT, LLC and** | ) | **JURY TRIAL DEMANDED** |
| **CONCESSIONS INTERNATIONAL, LLC,** | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff, Jacquelyn Williams, and for her Complaint against Defendants Paschal's Restaurant, LLC and Concessions International, LLC, states as follows:

## NATURE OF ACTION

1. This is an action arising out of Plaintiff's employment with Defendants Paschal's Restaurant, LLC and Concessions International, LLC (together "Defendants"). Plaintiff seeks to redress discrimination based on her color (light-skinned Black), sex (female), and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* ("Title VII"). Plaintiff also brings

claim under the laws of the State of Georgia for the torts of intentional infliction of emotional distress and negligent retention/supervision.

## JURISDICTION AND VENUE

2.  This Court has original jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343(a)(4), 42 U.S.C. § 2000e-5(f)(3).

3.  Venue is proper in this Court under 28 U.S.C. § 1391 because this is the judicial district in which Defendants reside, and this is the district in which a substantial part of the events and omissions giving rise to the claim occurred.  Venue also is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) as this is the district in which the unlawful employment practices occurred and where the employment records relevant to such practices are maintained.

## CONDITIONS PRECEDENT

4.  Plaintiff has fulfilled all conditions precedent to institution of this action. She timely filed charges with the Equal Employment Opportunity Commission, ("EEOC") which the Defendants had knowledge of.  The charges raised claims of discrimination and harassment based on her color (light-skinned Black) and

retaliation.  The EEOC issued Plaintiff a Notice of Right to Sue, and this suit is filed within ninety (90) days of receipt of that notice.

5.    On March 16, 2020, Plaintiff contacted the EEOC through its online portal seeking to file a charge of discrimination.

6.     On April 7, 2020, Plaintiff completed and submitted on the portal the EEOC information questionnaire spelling out the basis of her charge which was assigned a case number.

7.    Because of the pandemic, it was not until July 1, 2020, that the EEOC finalized Plaintiff's EEOC charge submitted almost three (3) months earlier.

<u>PARTIES</u>

8.  Plaintiff, Jacquelyn Williams, is a female of color, who was employed by Defendants at Paschal's Restaurant located in Atlanta.

9.  Defendant Paschal's Restaurants, LLC is a domestic limited liability corporation, headquartered at 566 Wells Street, SW, Atlanta, Georgia that does business as Paschal's Restaurant in Fulton County, Georgia.  Defendant Paschal's Restaurants, LLC, individually and/or with the aggregation of employees of

Concessions International, LLC, is an employer as that term is defined in Title VII, 42 U.S.C. § 2000e(b).

10.  Defendant Concessions International, LLC ("Concessions") is a domestic limited liability corporation, headquartered at 566 Wells Street, SW, Atlanta, Georgia that operates Paschal's Restaurant in Fulton County, Georgia and a number of other restaurants and food and beverage establishments.  Concessions is an employer as that term is defined in Title VII, 42 U.S.C. § 2000e(b).

11.  Defendant Concessions operates and manages numerous food and beverage concessions at airports across the United States and in St. Thomas, Virgin Islands, as well as affiliates that include H.J. Russell & Company, hotels and Paschal's Restaurant ("Paschal's" or "Paschal's Restaurant") at which Plaintiff worked.

12.  The business and affairs of Paschal's are entirely and exclusively managed by Defendant Concessions.

13.  Defendant Concessions is responsible for supervision of the day-to-day operations of Paschal's, including staffing.

14.     Defendant Concessions is responsible for administrative aspects of Paschal's, including Human Resources, subject to "Employee Handbook For Concessions International, LLC and Affiliates."

15.     Plaintiff's application for employment at Paschal's was through Defendant Concessions on a Concessions International application form.

16.     On the website for Paschal's Restaurant, its email address is a Concessions International address: paschals@cint.com.  All employees who worked at Paschal's, including Plaintiff, had "@cint.com" email addresses.

17.     The Paschal's website is a restaurant website without a named contact. The only named contact for Paschal's is on Defendant Concessions website:  Zane Majors, Operations Manager, listed as a Concessions contact.

18.     To the extent Paschal's Restaurants, LLC is or has ever been considered the employer of Paschal employees, that was only for tax, corporate or other such purposes, with Defendant Concessions responsible for all aspects of the employment of the Paschal's Restaurant employees.

19.     Employees of Defendant Concessions handled Plaintiff's complaints of hostile environment and retaliation and otherwise controlled the employment relations of Paschal's Restaurant at which Plaintiff worked.

20.     The result of the investigation of Plaintiff's complaints of hostile environment was reported on Defendant Concessions' letterhead.

21.   Defendants Paschal's Restaurants, LLC and Concessions International, LLC ("Defendants") are single employers/integrated enterprises, joint employers and/or Defendant Concessions is considered the agent of Paschal's Restaurants, LLC, so that both are liable to Plaintiff for her claims.

<u>FACTS</u>

**BACKGROUND AND SUMMARY**

22.   During January 2019, Plaintiff contacted a third-party recruiting firm regarding a position as General Manager of Defendants' Paschal's Restaurant.

23.   Plaintiff interviewed during March 2019 with Zane Major, Director of Operations for Concessions, Arthur Banks, Executive Chef of Paschal's, and other of Defendants' managers.

6

24.   During the interview Banks told Plaintiff that she likely was not going to get the job, but if Plaintiff was hired he liked to have beautiful women around him at work.

25.   Although Plaintiff had applied and was qualified for the position of General Manager, she was notified on April 29, 2019,  by Akosua Nyannor, Director of Human Resources for Concessions, that Defendants were offering her a position as Assistant Manager at Paschal's Restaurant.

26.   Rather than hiring Plaintiff for the General Manager position for which she was qualified, Defendants hired a male, Tony Neeley, as General Manager.

27.   Most employees at Paschal's are Black employees with darker skin than Plaintiff.

28.   Beginning almost immediately upon Plaintiff's employment on May 9, 2019, and continuing through Plaintiff's last day of work on April  8, 2020, Plaintiff was subjected to sexual harassment and harassment based on her light skin tone: repeated unwelcome and offensive verbal comments which had the purpose and effect of creating an intimidating, hostile and offensive working environment.

29.   Most of the harassing statements were made by a management employee, Arthur Banks, a dark-skinned male, who was the Executive Chef and periodically the General Manager at Defendants' Paschal's Restaurant.

30.  Additionally, Banks encouraged Defendants' employees to make sexually inappropriate comments to Plaintiff and slurs or derogatory statements regarding Plaintiff's light skin color.

31.   Prior to Plaintiff's employment, Defendants, on information and belief, received complaints and/or knew or should have known about Banks' harassment of female employees and employees of light skin color, and the hostile environment based on sex and color at Paschal's Restaurant.

32.   Defendants failed and/or inadequately responded to the prior complaints and knowledge of the harassment and hostile environment as a result of which Plaintiff was subjected to harassment and the hostile environment.

33.   During Plaintiff's employment, Arthur Banks repeatedly solicited sexual favors and activity from female kitchen employees and rewarded participating employees with special benefits, thereby creating a hostile work environment for Plaintiff and other female employees.

34    Among other things, Banks often would escort female employees upstairs to an apartment provided to him by Defendants.  Employees believed that Banks was repeatedly using such employees to engage in sexual activity.  Additionally, Banks solicited female employees to record sexually provocative dancing on videotape and provide the videotape to him to watch in his office.

35.   Many of the employees succumbed to Banks' demands and were given special financial benefits in return, such as recording falsely increased work hours so that the employees were paid for unworked hours.

36.   Banks invited Plaintiff to go to his apartment in order for them to engage in sex and made comments suggesting that if Plaintiff acceded to his demands, she would receive benefits and her work life would be made easier.

37.   Plaintiff repeatedly informed Banks that the sexual harassment was not welcome, but he did not stop his offensive comments and requests for sexual favors.

38.   Plaintiff on numerous occasions reported the harassment and hostile environment to upper management and human resource managers of Defendants.

39.    In addition to Plaintiff's reports, on many occasions, a management official of Defendants, including Zane Major, Kimberly Ransom, Tony Neely, Ronald Shuffler, and Vivian Brown, directly observed the actual harassment.

40.    Although Defendants were aware of the offensive conduct toward Plaintiff and other female employees, Defendants took no steps which were effective in stopping the harassment of Plaintiff.

## PLAINTIFF WAS SUBJECTED TO A HOSTILE ENVIRONMENT BECAUSE OF HER SEX AND COLOR AND REPORTED THE CONDUCT

### Events Occurring in 2019

41.    On Plaintiff's initial workday on May 9, 2019, an employee commented, "If that yellow bitch don't get out of here, someone is going to hurt her."  Plaintiff reported the statement to Banks, who took no action to correct or discipline the offending employee, but instead responded, "I keep pretty women around me who follow me and do what I say."

42.    During Plaintiff's first months on the job, Plaintiff was contemptuously referred to as "yellow" on at least two dozen occasions by Banks and various employees.

43     Banks frequently referred to Plaintiff as a "bitch" in front of restaurant employees and encouraged other employees to call Plaintiff a bitch or yellow bitch.

44.    The derogatory use of the word "yellow" was akin to white employees repeatedly referring to an employee as "Black," and, when combined with the word bitch, "yellow bitch" equated to a female employee being called a "Black bitch."

45.    On about May 15, 2019, Plaintiff reported to General Manager Tony Neely that an employee had referred to her as "that yellow bitch" and that Banks had made a sexually inappropriate comment to her.  Neely indicated that nothing would be done, responding that Banks has "Zane (Major, Operations Manager) in his back pocket."

46 .   On or about May 18, 2019, Banks and another employee asked Plaintiff about the number of white people in her family because of her light skin and green eyes, and Banks negatively commented that Plaintiff was half-white.

47.    On numerous occasions, including on or about May 22, 2019, Banks would request sexual favors from Plaintiff telling her that he would make things better if Plaintiff would "give Big Daddy some" or "give me some comfort" or words to that effect.

48.   On about May 23, 2019, Plaintiff reported to General Manager Tony Neely that Banks had invited Plaintiff to give him sexual favors and had commented that Plaintiff had a lot of whites in her family because she was half white and had green eyes.  Neely again indicated that nothing would be done, merely responding: "you know Art does what Art wants."

49.   When an employee on or about May 28, 2019, referred to Plaintiff as "that yellow bitch," Banks laughed and took no steps to correct the employees.

50.   On or about May 28, 2019, Plaintiff reported to Zane Major that Banks laughed when an employee referred to her as a yellow bitch.  Mr. Major declined to do anything, replying to Plaintiff: ". . . (T)hat is just their way of reacting to anyone new."

51.    On or about early June 2019, Defendants hired Robelynn McNair, a former Vice President of Human Resources for Defendant Concessions, to consult regarding employment matters at Paschal's.  Plaintiff spoke with Ms. McNair.

52.   In her conversations with Ms. McNair, Plaintiff spelled out the sexually inappropriate and "yellow" comments she had suffered from Banks and Defendants'

employees.  Ms. McNair told Plaintiff that she would communicate with Zane Major regarding Plaintiff's complaints.

53.   On or about June 6, 2019, Plaintiff spoke with Mori Russell, Business Development Manager of Defendant Concessions.

54.   Plaintiff described to Ms. Russell, and an individual believed to be an attorney for Defendant Concessions, the offensive sexual statements by Banks and the hostile environment suffered by Plaintiff at the restaurant.  Ms. Russell stated that Defendants' leadership was aware of the abuse she was suffering at work, but it was Zane Major's job to fix; she added that she was sorry and walked into her office.

55.   On or about June 8, 2019, Plaintiff went to the corporate office of Concessions and told Akosua Nyannor, Human Resources Director for Concessions, about the sexual harassment and verbal abuse she was experiencing at the restaurant.

56.   As of on or about June 13, 2019, Plaintiff reported to Zane Major, Concessions' Operations Director, that she could not take what was happening with the hostile environment.

57.   On or about June 16, 2019, Plaintiff's husband, Rodney Williams, told General Manager Tony Neely that Banks had threatened Plaintiff and requested that Neely keep Plaintiff safe.

58.   On information and belief, Neely relayed this information to Zane Major, who then informed Plaintiff's husband that he was not welcome at the restaurant.

59.   On or about June 20, 2019, Concessions' Human Resources Director Akosua Nyannor asked Plaintiff how things were going at the restaurant.  Plaintiff burst into tears and told Ms. Nyannor that Banks would ask her for sex and threaten that Plaintiff would lose her job if she did not accommodate him.

60.   On or about June 2019, Plaintiff met with Sara Fernald, Chief Executive Officer of a team-building organization hired by Defendants.  Plaintiff reported the threats she was receiving and the hostile environment to which Plaintiff was subjected.

61.   Despite dozens of reports from Plaintiff and other employees regarding the abusive conduct of Banks in subjecting Plaintiff to a hostile environment based on Plaintiff's color and relentless sexual harassment of Plaintiff and other

14

employees, Defendants inexplicably appointed Banks as General Manager on or about June 27, 2019.

62.   Almost immediately after Banks was designated acting General Manager, he told Plaintiff, "If you don't get in line, I will have Zane bounce your yellow ass out."

63.   The repeated sexually inappropriate and colorist comments by Banks, now the General Manager, gave license to comments by the staff, thus intensifying the hostile environment suffered by Plaintiff. For example, one female employee commented that Plaintiff needed a woman to eat her pussy, causing Banks and other employees to laugh.  General Manager Banks took no steps to correct or reprimand the employee making the offensive comment.

64.   On or about early July 2019, after Banks arrived at the restaurant at Plaintiff's request to intercede in an altercation between employees, Banks angrily shouted obscenities to Plaintiff and threatened to assault her; Plaintiff ran from him to escape the assault. During this encounter Banks stated: "I am not playing with you.  I have tried to get you to see that this is not a democracy."  Banks departed saying: "Bitch, this is not over!"

15

65.  Plaintiff reported to Akosua Nyannor the confrontation, threats, and that Banks called her a "bitch" in front of employees.  Ms. Nyannor responded that she would convey the information to Zane Major.

66.   During late July 2019, an employee told Plaintiff that "Art (Banks) has instructed us to get you any way we want when you go running your f**king mouth."

67.   Defendants arranged for a meeting on or about July 29, 2019, to help resolve the hostile environment issues in the kitchen.  An employee approached Plaintiff stating, "Bitch, how long is it going to take for you to see we will hurt you," along with other verbal threats.  Zane Major, Director of Operations, heard the comment but took no steps to correct or discipline the employee.

68.   Although Plaintiff persistently reported the offensive comments and actions by Banks and some kitchen employees to Zane Major, he ignored the reports and even suggested to Plaintiff that she should go along with the request by Banks for sexual favors in order to make her job easier.

69.   During September 2019, Banks approached Plaintiff and stated: "If you open your mouth about anything that has happened, things are not going to be good for you."

70.   On or about early September 2019, when Ms. Nyannor came to the restaurant to eat she asked Plaintiff how she was doing.  Plaintiff responded that the abuse on the job still was happening.

71.  During early October 2019, Ronald  Shuffler  was  hired  as  General Manager.  On his first day, Plaintiff had a prolonged conversation with Shuffler regarding the history of abuse suffered by her. Mr. Shuffler stated that the situation would change under his leadership.

72.   During October 2019, Banks told Plaintiff, "I heard you telling things to your uncle (Ron Shuffler). Nothing is going to change until you do what I ask. Look at how the other females treat Big Daddy; get your yellow ass in line."

73.   On or about November 14, 2019, Banks asked Plaintiff when she was going to learn that unless you "give me some ass, life is going to be hell for you? You better give me what I have been asking you for."

74.   On a Sunday in December 2020, while HR Director Nyannor was in the restaurant, Banks told Plaintiff to report to Nyannor that he said Plaintiff's pussy is dry because she was f\*\*king the same man, and that Ms. Nyannor would not do

anything.  Plaintiff reported Banks' extremely offensive comment to Nyannor whose only response was that she was not working that day.

### Events Occurring in 2020

75.    Throughout the time Plaintiff was employed in 2020 as before, Banks made repeated demands for sexual favors from Plaintiff.  For example, he told Plaintiff that if "she would give Big Daddy some," things would get better for her and if she "would fall in line her life would improve."

76.    On or about January 6, 2020, Kimberly Ransom, a general manager for Concessions, was assigned to help resolve issues in the restaurant kitchen.  When Plaintiff told Ms. Ransom about the harassment she was experiencing, Ms. Ransom responded that everyone in the company knows what Banks is doing.

77.    During the first week of January 2020, Banks tried to convince Plaintiff to give Natasha, the lead cook, extra money.  Banks said to Plaintiff that if she gave him some ass, he would get her extra money as well.

78.    Later in January 2020, shortly before Plaintiff's birthday on January 24, she was discussing thoughts about what she wanted for her birthday.  Banks suggested that she wanted him, "all of Big Daddy."  Plaintiff asked Banks to stop.

Banks's response was that "my girls they are happy when Big Daddy gives them a gift" and Plaintiff needed him to show that to her.

79.    Shortly after Plaintiff's birthday, Banks called Plaintiff to his office. Plaintiff asked Banks what he wanted, and he told Plaintiff to come in.  When she did, Plaintiff found Banks sitting with his legs open, his hand on his leg and the front of his pants wet.  Banks smiled at Plaintiff and said, "You know, see what you do."

80.    After the above incident, Plaintiff turned and walked away, frustrated that there was no one to whom she could report the incident who was going to do anything.

81.    During the first week of February 2020, Plaintiff noticed that, in response to her request for employee emergency contact information, all the females listed Banks.  When Plaintiff mentioned that to Banks, he responded "When are you going to learn, Big Daddy gets want he wants. After I get you where I want you, you will list me as your emergency contact too."

**PLAINTIFF'S ESCALATION OF HER COMPLAINTS OF HARASSMENT AND HOSTILE ENVIRONMENT IN FEBRUARY 2020**

82.    Throughout her employment, Plaintiff initiated numerous conversations with almost every management official of Defendants, including but not limited to:

Donata Russell Ross (Chief Executive Officer); Zane Major (Operations Manager); Akosua Nyannor and Anna Avelino (Human Resources); Mori Russell (Business Development Manager); Tony Neely, Ronald Shuffler, and Kimberly Ransom (General Managers); seeking help to put an end to the hostile environment she experienced because of sexual harassment and her color.

83.    Despite reports by Plaintiff to numerous management members over a prolonged period regarding the egregious sexual harassment and the hostile environment based on color, Defendants had not counseled or issued corrective discipline to offenders, had not engaged in employee meetings to educate employees regarding acceptable behavior, and not issued not a single notice that emphasized any company position against harassment in the workplace.   As a result, the harassment and hostile environment continued.

84.    In February 2020, Plaintiff became aware that General Manager Ronald Shuffler would not be successful in halting the offensive conduct of Banks and correcting the hostile environment at Paschal's.   At that time, Mr. Shuffler acknowledged to Plaintiff that there was nothing he could do to protect Plaintiff from harassment.   Mr. Shuffler stated that he had reported the circumstances all the way

up to the top level of Concessions, including to Donata Russell Ross, Chief Executive Officer, who told Shuffler that it was his job to get Plaintiff in line, to shut up, and stop complaining.

85.   Around this same time, Plaintiff's mental and physical health, which had suffered as a result of the harassment and hostile environment, worsened.  Plaintiff, who is a diabetic, went home sick, her heart racing, blood sugar very high and vision with spots.  Plaintiff reported to Defendants on the return of the headaches she experienced and visited her physician.

86.   On February 16, 2020, Plaintiff sent an email to General Manager Ron Shuffler referring to the panic attack she suffered and requesting a meeting with Defendants' officials so that she could spell out in detail and at one time what was done to her and what she had gone through.

**DEFENDANTS' INVESTIGATION OF PLAINTIFF'S COMPLAINTS**

87.   Plaintiff was summoned to a meeting with Anna Avelino, Benefits Manager of Concessions, and Operations Manager Zane Major on February 19, 2020, to hear her complaints. Plaintiff objected to the participation in the

investigation by Mr. Major and requested that he not be involved because he had been part of the problems faced by Plaintiff.

88.   During the meeting Plaintiff stated that she "cannot take it anymore," spelling out the basis of her complaints of harassment based on sex and color. Plaintiff stated that she was scared to be in the environment that had been created in the restaurant because of the sexually inappropriate comments and the offensive comments regarding her color and the threats of harm toward her.

89.   Zane Major responded to Plaintiff stating that, "we are all black here" and that Plaintiff "was taking things too seriously."

90.   Ms. Avelino asked Plaintiff what she wanted done to solve the problems and what would make Plaintiff complete.

91.   Plaintiff responded that Defendants should fire Banks and train the staff to avoid such statements and conduct. Mr. Major responded that her request was harsh and that restaurant employees are loyal to Banks.

92.   On February 19-20, 2020, Defendants' managers Zane Major and Anna Avelino interviewed a number of Defendants' restaurant employees regarding Plaintiff's allegations of sexual and color harassment and abuse.

93.   On information and belief, Arthur Banks was interviewed regarding Plaintiff's complaints by only Zane Major.

## SUBSTANTIATION OF PLAINTIFF'S COMPLAINTS FOLLOWED BY INACTION TO ADDRESS THEM

94.   After the investigation was completed and shortly before the scheduled meeting with Plaintiff to review the conclusions of the investigation, Defendants discharged General Manager Ron Shuffler, the only manager who had demonstrated any motivation to stop the harassment.

95.   Ms. Avelino and Zane Major met with Plaintiff on March 4, 2010, to disclose findings of the investigation they had conducted.

96.   Anna Avelino stated that Plaintiff's complaints of a hostile environment had been substantiated and apologized that Plaintiff had endured the circumstances. Plaintiff was handed a letter from Defendant Concessions dated March 4, 2020, confirming that "your complaint was substantiated" and establishing steps to be taken by Defendants in response to the complaint.

97.   On information and belief, Defendants did not subject Banks to corrective discipline after the investigation substantiating his egregious behavior toward

Plaintiff -- his sexually inappropriate comments and his offensive statements regarding Plaintiff's color.

98.   Defendants stated in the report of the investigation that they would conduct "an immediate staff meeting to inform everyone that a hostile work environment will not be tolerated" and "provide training to employees regarding appropriate and inappropriate behavior/language in the workplace."

99.   Defendants failed to conduct such meetings and training, as a result of which Plaintiff continued to suffer from harassment by employees and management.

## THREATS AND HARASSMENT OF PLAINTIFF AFTER AND IN RETALIATION FOR HER ESCALATED COMPLAINT AND THE INVESTIGATION

100.   Immediately after Plaintiff spelled out her complaints to Defendants on February 19, 2020, Arthur Banks threatened Plaintiff regarding her reports of harassment and hostile environment and told restaurant employees that Plaintiff had reported their behavior to management.

101.   Arthur Banks told Plaintiff that he had learned what she had told Anna Avelino and Zane Major, stating that, "she was going to pay for that."

102.  When Banks returned to the restaurant from his meeting with Mr. Major he asked employees where was the "tattletale," referring to Plaintiff, and told Plaintiff that "your yellow ass should be concerned" because she had raised complaints with Defendants regarding the hostile environment.

103.  Anna Avelino sent Plaintiff a letter on February 25, 2020, stating: "The Company will protect you from any retaliation that you experience as a result of coming forward with your allegations and cooperating with the investigation. Please notify me immediately if you have been retaliated against."

104.   Plaintiff on February 28, 2020, contacted Ms. Avelino and described Bank's threats upon returning to the restaurant after he was interviewed by Zane Major.

105.   On or about March 2, 2020, Plaintiff told Anna Avelino that the hostility toward her from other employees was increasing as a result of statements by Banks. Ms. Avellino told Plaintiff that she was not present when Zane Major spoke with Banks but that she would investigate the breach of confidentiality.

106.    Despite the promise to protect Plaintiff from any retaliation, Defendants took no steps to prevent the retaliatory conduct by Arthur Banks and his encouragement to employees that they should make life difficult for Plaintiff.

107.    In or about early April 2020, Plaintiff was assigned to do inventory with Banks.  Banks stated to Plaintiff something like don't bring your dry ass pussy back here, send Kimberly she wears those tight ass skirts, and we know her pussy is wet because she has not been f**ked in years.

108.    Plaintiff reported what Banks said to Kimberly Ransom who had been appointed temporary General Manager; Ransom required Plaintiff to go back and help Banks with inventory.  Plaintiff did as she was asked but told Banks she would not listen to his harassing statements.  Banks told Plaintiff she would not be back to hear such statements, saying "no ass, no job."

109.    At the end of the inventory, Ms. Ransom told Plaintiff her problem was that she did not know how to play the game.

**DEENDANTS' RETALIATION AGAINST PLAINTIFF AFTER SHE
ESCALATED COMPLAINTS OF SEXUAL HARASSMENT AND
HARASSMENT BASED ON HER COLOR,  PARTICIPATED IN
THE INVESTIGATION OF THE COMPLAINTS,
AND FILED AN EEOC CHARGE**

110.   Plaintiff's escalated complaints and the investigation of the complaints led to the termination of Mr. Shuffler on March 3, 2020, and the opening of the General Manager position.

111.   Plaintiff was fully qualified to serve as General Manager for reasons including that, throughout her employment at Paschal's, she performed most of the duties of the position.

112.   Defendants, in retaliation for Plaintiff's escalated complaints and the investigation of the complaints, refused to assign Plaintiff to the position of General Manager for which she was qualified.

113.   Throughout her employment, Plaintiff was a dedicated employee who was repeatedly praised for her performance.   Plaintiff received positive reviews of her performance and did not receive discipline or counseling prior to escalating her complaints of sexual and color harassment and the ensuing investigation in which she participated.

114.   On March 4, 2020, the same day Plaintiff received the letter confirming that her complaint was substantiated and establishing steps to be taken by Defendants in response to the complaint, Plaintiff received a disciplinary warning

letter from Defendant Concessions.  The letter criticized Plaintiff's performance, for the first time, citing areas of communications and developing operational procedures.

115.   This unjustified disciplinary warning was retaliatory and a first step toward discharging Plaintiff in retaliation for her escalated complaints and the investigation in which she participated:  The warning was administered to punish Plaintiff and would not have been issued but for the complaint and the investigation it triggered in which Plaintiff participated, which investigation substantiated her complaints.

116.  After the meeting to discuss the substantiation of Plaintiff's complaints, Kimberly Ransom, who had been appointed temporary General Manager, informed Plaintiff of the retaliatory diminution in Plaintiff's duties, stating: "You have done it now" before describing duties Plaintiff would no longer perform including scheduling of front-of-the-house employees, making trips to the bank, preparing daily reports, and other duties.

117.   Removing duties performed by Plaintiff and transferring such duties to other employees was part of a plan by Defendants to ensure that the duties of

Plaintiff's job could be performed after Defendants completed a rapid discharge of Plaintiff in retaliation for Plaintiff's complaints and participation in the investigation of the complaints.

118.   On or about April 3, 2020, Kimberly Ransom told Plaintiff that she should go to the Equal Employment Opportunity Commission because of the treatment she was receiving from Defendants.

119.   On April 8, 2020, Defendants notified Plaintiff that she would be laid off temporarily because of "lack of work" as part of a reduction in force due to Covid-19.

120.   Kimberly Ransom told Plaintiff that Defendants would use the Covid layoff as justification for not returning Plaintiff to work.

121.   After July 2020, Defendants learned that Plaintiff had filed a Charge of Discrimination with the EEOC.

122.   On October 29, 2020, Defendant wrote to Plaintiff advising that her employment status has been changed from "temporary laid off" to "laid off."

123.   In or around December 2020, Defendants learned that Plaintiff had filed with the EEOC an amended Charge of Discrimination to address the change in her employment status in October to "laid off" and the continued retaliation.

124.   During December 2020 and early January 2021, Defendant advertised for employees and commenced operation of the restaurant.

125.   Although Defendant has hired managerial employees for the restaurant, it has failed and refused to return to work Plaintiff who has been on a status of a "laid off" employee.

126.   Defendant's failure and refusal to return Plaintiff to work from layoff constitutes retaliation under Title VII.

## ADDITIONAL FACTS

127.   On or around February 28, 2020 – subsequent to Plaintiff reporting that she was suffering from panic attacks due to the hostile environment and Plaintiff's complaints of hostile environment were substantiated, and when Plaintiff reported to Anna Avelino Bank's threats upon returning to the restaurant after he was interviewed by Zane Major –- Ms. Avelino contacted Plaintiff and suggested she could schedule therapy through the Concessions Employee Assistance Program.

30

128.   Plaintiff consulted a therapist through the EAP but was allowed only a limited number of visits.

129.   Plaintiff has since undergone therapy with another mental health counselor and currently sees a therapist regularly to deal with the emotional distress she continues to experience as a result of the hostile work environment and retaliation at the restaurant.   Plaintiff anticipates that mental health therapy will continue for a prolonged period.

130.   The emotional distress suffered by Plaintiff has included but was not limited to, agitation, sleeplessness, frustration, anger, irritation, depression, despondency, fear, anxiety attacks, panic attacks, nervousness, humiliation, degradation, feelings of helplessness, lack of confidence, distrust of others, and difficulties in personal relationships.   For example, Plaintiff, who prior to working at Paschal's was comfortable in a work setting, is fearful on her current job without reason.   The emotional distress has also included headaches, high blood pressure, blood sugar problems, appetite disorders, weight gain, and other physical manifestations. Plaintiff suffered past and future pecuniary and non-pecuniary losses.

131.   Defendants acted willfully and with malice, wantonness, oppression, and/or reckless indifference to Plaintiff's federally protected rights and the consequences of its actions and failures to act.

## CAUSES OF ACTION

## COUNT I (Sexual and Color Harassment in Violation of Title VII)

132.   Plaintiff incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1 through 131 of this Complaint.

133.   During Plaintiff's employment, Plaintiff was subjected to unwelcome harassment based on Plaintiff's sex, including verbal and physical advances of a sexual nature, and also based on her color – her light skin tone compared to other Black employees.

134.   The harassment was sufficiently severe and/or pervasive to, and did, alter the terms and conditions of Plaintiff's employment and create a discriminatorily abusive working environment.

135.   Defendants are liable to Plaintiff under Title VII for reasons which include but are not limited to the fact that they are considered an integrated

enterprises/a single employer, joint employers, and/or because Defendant Concessions is considered the agent of Paschal's Restaurant for purposes of liability.

136.   Defendants also are liable because they had notice from Plaintiff's complaints, and otherwise knew, of the sexual harassment of Plaintiff and the harassment based on her color and failed to take action to ensure that such offensive conduct would cease.  As a direct result of their failure to take effective action, such conduct by Defendants' management employee Banks and other employees continued toward Plaintiff.

## COUNT II (Retaliation in Violation of Title VII)

137.   Plaintiff incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1 through 136 of this Complaint.

138.   After Plaintiff escalated her complaints of sexual harassment and harassment based on color, and she participated in the investigation which substantiated her complaints, Plaintiff was retaliated against as follows:  Banks threatened Plaintiff; hostility by Banks and other employees increased; Defendants refused to assign Plaintiff the position of General Manager that had come open; Defendants issued Plaintiff a disciplinary warning; Plaintiff was relieved of certain

of her duties; and Defendants failed and refused to return Plaintiff to work after Paschal's Restaurant reopened.

139.   Defendants' failure and refusal to return Plaintiff to work after Paschal's reopened also was in retaliation for Plaintiff filing Charges of Discrimination with the EEOC.

140.   Defendants are liable to Plaintiff for the retaliation under Title VII for reasons which include but are not limited to the fact that they are considered an integrated enterprises/a single employer, joint employers, and/or because Defendant Concessions is considered the agent of Paschal's Restaurant for purposes of liability.

141.   Defendants also are liable to Plaintiff for retaliation in violation of Title VII because they knew of Plaintiff's escalated complaints of sexual and color harassment, her participation in the investigation which substantiated her complaints, the filing of Plaintiff's EEOC charges, and because Defendants were involved in the retaliatory actions taken against Plaintiff.

## COUNT III (Intentional Infliction of Emotional Distress)

142.   Plaintiff incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1 through 141 of this Complaint.

143.    The repeated sexual and color harassment of Plaintiff during Plaintiff's employment, the threats by Defendants' management employee Arthur Banks against Plaintiff, and the retaliation against Plaintiff by Defendants was extreme and outrageous, undertaken intentionally, and caused Plaintiff severe emotional distress.

144.    Defendants are liable to Plaintiff for intentional infliction of emotional distress because they knew or should have known about the sexual and color harassment and threats but failed to take action to stop and/or prevent the harassment of Plaintiff and hostile work environment.

145.    Defendants are liable to Plaintiff for intentional infliction of emotional distress because they deliberately set out to retaliate against Plaintiff for her escalated complaints of sexual and color harassment, her participation in the investigation which substantiated her complaints, and the filing of Plaintiff's EEOC charges.

## COUNT IV (Negligent Retention/Supervision)

146.    Plaintiff incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1 through 145 of this Complaint.

147.   Prior to Plaintiff's employment, Defendants, on information and belief, received complaints and/or knew or should have known about Arthur Banks' harassment of female employees and employees of color, and the hostile environment based on sex and color at Paschal's Restaurant.

148.   Defendants failed and/or inadequately responded to the prior complaints and knowledge of the harassment and hostile environment as a result of which Plaintiff was subjected to harassment and the hostile environment.

149.   Defendants knew or should have known that, during Plaintiff's employment, Arthur Banks repeatedly solicited sexual favors and activity from female kitchen employees and rewarded participating employees with special benefits thereby creating a hostile work environment for Plaintiff and other female employees.

150.   Defendants were aware from Plaintiff's complaints, by direct observation, and reports from managers that Banks was sexually harassing Plaintiff, harassing Plaintiff because of her light skin color, subjecting Plaintiff to an abusive and hostile work environment, and encouraging other employees to harass Plaintiff and subject her to abuse.

151.   The action of Defendants in retaining and inadequately supervising Banks and failing to act after learning of Plaintiff's complaints allowed the harassment and abuse to occur and continue.

152.   Defendants are liable for negligent retention and supervision of Banks.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff prays that this Court:

a)     Declare that the acts and practices complained of herein are in violation of Title VII;

b)     Enjoin Defendants from engaging in such conduct in the future;

c)     Direct Defendants to make Plaintiff whole for all earnings, including fringe benefits, Plaintiff would have received but for the discriminatory treatment of her;

d)     Direct Defendants to reinstate Plaintiff;

e)     Award to Plaintiff and against Defendants compensatory and punitive damages under Title VII;

f)     Award to Plaintiff and against Defendants general, compensatory, and punitive damages under the laws of the State of Georgia for her claim of intentional

infliction of emotional distress in amounts to be determined at trial but not less than a total Five Hundred Thousand Dollars ($500,000);

g)     Award Plaintiff her costs and attorneys' fees, and pre- and post-judgment interest; and

h).     Grant such other and further relief as this Court deems just and proper.

<u>DEMAND FOR A TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Respectfully submitted,

<u>s/A. McArthur Irvin</u>
A. McArthur Irvin
Georgia Bar No. 384300
404.237.5075
mirvn@ibhslaw.com

<u>s/ Sandra Kaye Bowen</u>
Sandra Kaye Bowen
Georgia Bar No. 409315
404.237.1033
sbowen@ibhslaw.com

IRVIN BOWEN LLC
1100 Peachtree Street
Suite 900
Atlanta, GA 30309                 Attorneys for Plaintiff